RECEIVED
AUG 30 2018
AT 8:30 _____ M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. |
| | : |
| | : Criminal No. 18- cr - 516 - mas |
| v. | : |
| | : |
| | : 18 U.S.C. § 371 |
| JEFFREY E. GOLDMAN | : 18 U.S.C. § 1343 |
| | : 18 U.S.C. § 2 |

## INDICTMENT

The Grand Jury, in and for the District of New Jersey, sitting at Newark, charges:

### Relevant Individuals and Entities

1. At all times relevant to this Indictment:

   a. Defendant JEFFREY E. GOLDMAN ("GOLDMAN") resided in or around Michigan and operated an online day trading firm, referred to herein as "Trading Firm A."

   b. "CC#1," a co-conspirator not named as a defendant herein, also resided in or around Michigan and was GOLDMAN's partner in Trading Firm A.

   c. Nonko Trading ("Nonko") was an online day trading firm owned and controlled by Naris Chamroonrat ("Chamroonrat").

   d. Chamroonrat, a co-conspirator not named as a defendant herein, was a citizen of the United States and Thailand who owned Nonko and handled its daily operations.

    e. Yaniv Avnon ("Avnon"), a co-conspirator not charged as a defendant herein, was a citizen of Israel and owned and controlled G Six Trading Y.R. Ltd. ("G6 Trading"), a company that provided online securities trading training programs. Avnon used G6 Trading to solicit day traders for Nonko.

    f. Ran Armon ("Armon"), a co-conspirator not charged as a defendant herein, was a resident of Canada. Armon worked for Avnon in connection with G6 Trading and also solicited investors for Nonko.

    g. Company A was a provider of electronic trading software that maintained computer servers in or around Carteret, New Jersey. From in or about 2012 through in or about September 2014, Nonko provided its customers access to Company A's trading software.

    h. Logix Software Company Limited ("Logix") was a Thailand-based provider of electronic trading software that Chamroonrat and other co-conspirators launched in or around September 2014.

## COUNT ONE
(Conspiracy to Commit Securities Fraud)

2.      Beginning no later than in or about December 2013 and continuing through in or about June 2015, in the District of New Jersey and elsewhere, defendant

**JEFFREY E. GOLDMAN**

knowingly and willfully conspired and agreed with others to, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, as set forth in more detail below, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Goal of the Conspiracy

3.      It was the goal of the conspiracy for GOLDMAN and his co-conspirators to profit illegally by stealing the money day traders entrusted to

Nonko on the understanding that the traders would be able to use the money to buy and sell securities on the open market.

## Overview of the Conspiracy

4. Between in or about December 2013 and in or about June 2015, GOLDMAN, CC#1, Chamroonrat, and others orchestrated a scheme to defraud hundreds of investors worldwide through their operation of Nonko Trading, a purported day trading firm. The co-conspirators solicited individual investors to open day trading accounts with Nonko and to wire thousands of dollars to Nonko for the purpose of funding those accounts. But rather than using those deposits to fund securities brokerage accounts, the co-conspirators simply stole the victims' money. To cover up the theft, the co-conspirators provided the victims with online trading simulator, or "demo," accounts, and falsely represented to the investors that those accounts were real accounts to be used for trading securities.

## Manner and Means of the Conspiracy

### A. Nonko's Solicitation of Traders and the "TRZ Program."

5. It was part of the conspiracy that Nonko operated as a purported proprietary trading firm for investors interested in day trading securities in the United States. GOLDMAN and CC#1 helped Chamroonrat create Nonko as an offshore firm that could open accounts for traders that Trading Firm A could not accept due to certain regulatory requirements applicable to firms based in the United States. Chamroonrat, in turn, shared a percentage of Nonko's profits with GOLDMAN and CC#1.

6. It was further part of the conspiracy that, to attract day traders, Nonko offered low commission rates, low minimum deposits, and generous leverage (or margin) ratios of 20:1. In addition to online marketing tactics that promoted these terms, Nonko relied on various third-party "affiliates," or sub-contractors, to refer traders to open accounts with Nonko. These affiliates received a percentage of the profits generated by the traders they referred.

7. It was further part of the conspiracy that Nonko provided its customers with access to live trading accounts set up on an electronic securities trading platform provided by Company A (the "Company A Platform"). The Company A Platform included a training feature that allowed users to test the platform in a simulated environment. This training account feature was not programmed to send the users' "orders" to any market centers for execution, but simply generated records of potential, or simulated, "executions" of the orders, based on then-current market prices for the securities in question. The Company A Platform assigned all training accounts the prefix "TRZ."

8. It was further part of the conspiracy that, in or about late 2013, GOLDMAN, CC#1, Chamroonrat and their co-conspirators began defrauding Nonko traders by assigning them to use the TRZ demo accounts while representing that they were using active accounts to place real securities trades. This allowed the co-conspirators to steal the money the traders had given Nonko without their knowledge or consent. The co-conspirators then transferred the customers' deposit funds to accounts controlled by

Chamroonrat and he used the money for personal expenses and other unauthorized transactions, including transferring a portion of the illicit proceeds to GOLDMAN and CC#1. The co-conspirators referred to the training account scheme as their "TRZ Program."

9. It was further part of the conspiracy that, to ensure the scheme would not be detected, the co-conspirators selected as victims only those customers who they believed would not be profitable day traders and would be less likely to seek to withdraw funds from their accounts. The co-conspirators limited the TRZ Program to inexperienced and unsophisticated traders who were likely to believe they had lost their money trading in the open markets. Indeed, the profitability of the scheme was contingent on customers remaining "losers" because profitable traders were ineligible for the TRZ Program.

10. It was further part of the conspiracy that GOLDMAN and CC#1 had access to Nonko's internal accounting software and could observe the firm's profits and losses, including whether TRZ traders were losing money or becoming profitable. For instance, on or about December 4, 2013, GOLDMAN sent Chamroonrat an online message and stated, "trz group down 3k ... every trader down. How come part of me feels good and part of me feels bad?!?!??" On or about December 17, 2013, GOLDMAN pointed out in another message that a particular TRZ trader appeared to be generating profits, which was against the scheme's model. GOLDMAN stated, "why are you letting TRZNK3015 make money??"

11. It was further part of the conspiracy that, by in or around February 2014, Chamroonrat and other co-conspirators began discussing a plan to create their own trading platform - one that would not use the "TRZ" label for training accounts - so that, as one co-conspirator described in an online chat communication, it would "look like the real deal." The co-conspirators eventually did develop their own trading platform called "Logix" and used it to continue the scheme between late 2014 and 2015.

12. It was further part of the conspiracy that GOLDMAN and CC#1 provided Chamroonrat with necessary guidance and advice about carrying out the scheme. Additionally, GOLDMAN provided back office and accounting support to facilitate the scheme, including managing the back office program that the co-conspirators used and keeping track of activity and balances in Nonko user accounts. Similarly, CC#1 handled banking issues, including instructing Chamroonrat on fund transfers and completing various bank account applications.

13. It was further part of the conspiracy that GOLDMAN and CC#1 communicated with Chamroonrat in online chats about the manner in which they would carry out the scheme and methods to avoid detection by the victims or others. For instance, on or about December 27, 2013, Chamroonrat wrote, "we are telling traders that it is a trainer, starter account .. that has lower software[.] [B]ut if you feel that[']s too dangerous, we can halt creating new trz accounts from 'new incoming' accounts[,] see how they do first then convert, versus offering it right away." GOLDMAN responded that it was Chamroonrat's

decision, but that he would "hate to have it on [the online trading blog] that all traders are really on a demo." Chamroonrat then stated, "we might be able to get away with saying it[']s a trainer account and not really a demo account[,] but what if they ask [if] it[']s a demo account, do we say otherwise[?] This is for new incoming accounts[,] brand new[.]" GOLDMAN responded, "[C]all it a training account with lower rates ... I thought that[']s what we talked about would make sense[,] lower rate and lower software fee[,] but in exchange some orders may get routed elsewhere." In reality, all of the securities orders placed through Nonko's TRZ accounts were purely simulated and were not live orders.

14. It was further part of the conspiracy that the co-conspirators used a document entitled "TRZ GUIDELINE," which Chamroonrat drafted based, at least in part, on guidance from GOLDMAN. Among other things, this document provided guidelines for determining whether to place a customer on a TRZ account instead of a live trading account and suggested false responses to questions that the co-conspirators anticipated customers would ask about the TRZ accounts, including, "why does the bid/offer not change when I put out a limit order[?]" to which the guide states, "that can be explained by saying the ECN they are using is a dark pool[.]" These fabricated responses were designed to deceive Nonko's customers into believing that they were trading with live accounts.

15. It was further part of the conspiracy that on or about December 27, 2013, Chamroonrat sent a draft of the TRZ Guideline to GOLDMAN in an

online chat. Chamroonrat asked GOLDMAN, "anything u want to add?" GOLDMAN responded, "no....looks good."

### B. The Co-Conspirators Attempt to Cover Up the Scheme After Company A Terminates its Relationship with Nonko.

16. It was further part of the conspiracy that GOLDMAN, Chamroonrat, CC#1 and their co-conspirators attempted to cover up the scheme after Company A discovered the fraud and disclosed it to Nonko's customers. On or about August 29, 2014, Company A sent out an email to all Nonko customers alerting them that accounts starting with "TR" were training accounts. Company A then discontinued its relationship with Nonko. The same day, Chamroonrat and CC#1 discussed ways to respond to the notification by Company A and how to further mislead their customers. Chamroonrat wrote that he planned to contact Company A, and CC#1 responded, "[D]on't admit to anything, probably nothing now."

### C. The Co-conspirators Continue the Scheme through Logix.

17. It was further part of the conspiracy that the co-conspirators began using their Logix trading platform after Company A discovered their scheme. Shortly after Company A's disclosure, the co-conspirators began misrepresenting to their customers that Nonko was moving to Logix because of its technological superiority.

18. It was further part of the conspiracy that, from in or about September 2014 through at least in or about June 2015, the co-conspirators continued to defraud Nonko's customers by misappropriating their account

deposit funds and placing them on demo accounts without their knowledge and consent, using Logix as Nonko's purported trading platform.

### D. The Co-Conspirators' Diversion of Customer Funds and Scheme Profits.

19. It was further part of the conspiracy that, during the time period of the conspiracy, the co-conspirators misappropriated at least $1.4 million from over 260 investors residing in over 30 countries worldwide. The victims of the scheme included at least 180 investors from the United States, including individuals in New Jersey.

### Overt Acts

20. In furtherance of the conspiracy and to effect the unlawful object thereof, defendant GOLDMAN and others committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere:

    a. On or about December 27, 2013, Naris Chamroonrat sent GOLDMAN an electronic communication attaching a document entitled "TRZ GUIDELINE," which provided guidance on carrying out the securities fraud scheme described herein.

    b. On or about May 2, 2014, Avnon sent an email to an individual located in New Jersey containing wire instructions for submitting payment to purportedly fund a securities trading account with Nonko.

    c. On or about May 13, 2014, Avnon and Armon caused a wire transfer in the amount of $2,500 to be sent from a bank account in New Jersey to a bank account in Belize that Chamroonrat controlled.

10

    d. On or about November 6, 2014, Chamroonrat sent CC#1 an electronic communication that included the username and password to access an online accounting program that Nonko used to record its profits and losses.

All in violation of Title 18, United States Code, Section 371.

## Count Two
(Wire Fraud)

  1. The allegations set forth in Paragraphs 1 and 3 through 20 of Count One of this Indictment are hereby repeated, realleged, and incorporated as if fully set forth herein.

  2. On or about May 13, 2014, in the District of New Jersey and elsewhere, defendant

**JEFFREY E. GOLDMAN**

knowingly and intentionally devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, specifically, a wire of approximately $2,500 from a bank account in New Jersey to a bank account in Belize.

In violation of Title 18, United States Code, Section 1343 and Section 2.

11

## **FORFEITURE ALLEGATION**

1. As a result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One and Two of this Indictment, defendant GOLDMAN shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the wire fraud and conspiracy to commit securities fraud offenses, and all property traceable thereto.

### **Substitute Assets Provision**

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

A TRUE BILL

Foreperson

_____
CRAIG CARPENITO
UNITED STATES ATTORNEY

CASE NUMBER: 18-cr-516-MAS

**United States District Court
District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**JEFFREY E. GOLDMAN**

**INDICTMENT FOR**

18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 2

**CRAIG CARPENITO**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

**NICHOLAS P. GRIPPO**
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2915*